**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FLUET & ASSOCIATES, PLLC**<br>1751 Pinnacle Drive<br>Suite 1000<br>Tysons, VA 22102<br><br>*Plaintiff*,<br><br>*v.*<br><br>**U.S. DEPARTMENT OF THE TREASURY**<br>1500 Pennsylvania Avenue N.W.<br>Washington, D.C. 20220<br><br>SERVE:<br>Janet Yellen<br>United States Secretary of the Treasury<br>1500 Pennsylvania Avenue N.W.<br>Washington, D.C. 20220<br><br>Matthew M. Graves<br>U.S. Attorney's Office for D.C.<br>601 D Street, NW<br>Washington, D.C. 20530<br><br>*and*<br><br>**INTERNAL REVENUE SERVICE**<br>1111 Constitution Avenue N.W.<br>Washington, D.C. 20224<br><br>SERVE:<br>Danny Werfel<br>Commissioner of the IRS<br>1111 Constitution Avenue N.W.<br>Washington, D.C. 20224<br><br>Matthew M. Graves<br>U.S. Attorney's Office for D.C.<br>601 D Street, NW<br>Washington, D.C. 20530<br><br>*Defendants*. | Case No. _____ |

**<u>COMPLAINT</u>**

Plaintiff Fluet & Associates, PLLC ("Fluet") hereby brings this action against the U.S. Department of the Treasury ("Treasury") and the Internal Revenue Service ("IRS") to compel these agencies' compliance with the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. In support thereof, Plaintiff hereby states the following:

## SUMMARY

1.      In Section 10301(1)(B) of the Inflation Reduction Act ("IRA") of 2022, Congress appropriated $15 million to the IRS to produce a report analyzing whether and how it could implement a free and direct efile system for tax returns, the costs of developing and operating such a system, and how taxpayers might view it (the "Report").

2.      The IRS' unanticipated decision to use some of the money from this provision of the IRA to build and implement a direct efile system and field it this month will fundamentally reshape the relationship between the IRS and American taxpayers, firmly inserting the IRS into the business of tax return preparation in contrast to over 100 years of practice since the United States Government began collecting income taxes in 1916.

3.      In the direct efile system being implemented, the IRS assumes the awkward—and arguably conflicting—position of participating in the preparation of tax returns it will both *file* and *audit.* For example, the IRS could theoretically track information entered into a draft tax return on its own direct efile system and subsequently utilize such information to identify filed returns for further examination or audit, even if the subject information was deleted from the final version of the return submitted to the IRS by the taxpayer.

4.      Understanding that this is an issue of significant public interest, in March 2023, undersigned counsel David Panzer, while practicing with his prior law firm Ward & Berry, PLLC

("WB"), submitted two sets of FOIA requests to both the Treasury and the IRS seeking records related to the Report (the "FOIA Requests").

5.      In particular, FOIA Requests sought records related to the involvement of nonprofit New America ("NA") and tax attorney and law professor Ariel Jurow Kleiman in the development of the Report, and records related to nonprofit Code for America ("CFA")'s relationship with the IRS. CFA is a prominent advocate for the deployment of free and direct efile systems at both the state and federal levels and has partnered with the IRS in the past on projects related to tax return preparation.

6.      For certain of the FOIA Requests, both the Treasury and the IRS have failed to satisfy even their initial obligation of determining whether they would comply with the request and communicating that decision to the Requester.

7.      Separately, for another of the Requester's FOIA requests, the IRS has produced only ten (10) pages of documents. This small production is only related to the discrete issue of the agency's prior correspondence with the Senate Finance Committee regarding the IRS' collaboration with CFA.

8.      The IRS Disclosure Manager subsequently denied the remainder of this FOIA request by determining, improperly, that the request was overly broad and that it sought the disclosure of "return information." *See* 26 U.S.C. § 6103(b)(2) (defining "return information," which includes "a taxpayer's identity, the nature, source, or amount of his income," etc.). While the Requester submitted an administrative appeal of that determination in October 2023, and an employee of the IRS' Independent Office of Appeals indicated to the Requester during a phone call on November 14, 2023 that the appeal would be denied, the Independent Office of Appeals

has yet to issue a written final decision. FOIA required the IRS to issue a final decision with respect to the Requester's administrative appeal within twenty working days.

9.      In the meantime, while the Requester struggled to obtain the public records it is entitled to receive under FOIA, the IRS released its report to Congress in May 2023. Furthermore, and as mentioned above, the Treasury and the IRS have chosen to use a portion of the funds allocated by Congress for drafting the Report to actually move forward with implementing a pilot version of the direct efile system. As the IRS explains on its website, the Treasury has directed it to roll-out "a limited Direct File pilot for the 2024 filing season to further assess customer support and technology needs and address solutions for issues identified in the report the IRS submitted to Congress earlier this year."[1] However, the IRA **only** authorized the IRS to draft the Report; it did not allocate any funds for the roll-out of the pilot program.

10.     In any event, the many public references made by the IRS to the pilot program, especially over the last few months, leave the ineluctable conclusion that both Defendants indeed possess records that are responsive to the FOIA Requests and that they should produce pursuant to the statute. Again, though, the IRS has thus far provided only a token number of documents to the Requester, which it had already provided Congress, and the Treasury has not provided **any** records to the Requester.

11.     Generally speaking, prompt access to the records responsive to the FOIA Requests is necessary to effectuate FOIA's purpose of providing meaningful government transparency. More specifically, the records sought in these various FOIA Requests are crucial for Mr. Panzer's, his

---

[1] *Direct File*, Internal Revenue Serv., https://www.irs.gov/about-irs/strategic-plan/direct-file (last visited Feb. 5, 2024).

clients', and the general public's understanding of an IRS program that will significantly impact all of America's taxpayers.

12.    In fact, in its 2023 Annual Report to Congress, delivered to Congress on January 10, 2024,[2] the National Taxpayer Advocate[3] identifies the third most serious problem at the IRS as "Transparency" and, specifically regarding direct efile, "The National Taxpayer Advocate recommends that the IRS: … 2. Provide specific and verifiable details on the Direct File pilot; the number of taxpayers utilizing the tool; processing successes, issues, and lessons learned associated with the tool; and the costs of a direct e-file system."[4]

13.    However, thus far, the Treasury and the IRS have prevented the Requester and others from learning about the direct efile system by declining to follow FOIA's requirements. This Court should order these agencies to comply with their obligations under FOIA.

14.    Therefore, Fluet, as Assignee of WB's FOIA rights, seeks declaratory relief establishing that the Treasury and the IRS have violated FOIA and injunctive relief directing the Treasury and the IRS to comply with FOIA's requirements to make determinations regarding each of the Requester's FOIA Requests and to produce records that are responsive to those requests.

---

[2]  *See*  https://www.taxpayeradvocate.irs.gov/reports/2023-annual-report-to-congress/newsroom/ (last visited Feb. 5, 2024).

[3] The National Taxpayer Advocate is "an independent organization within the Internal Revenue Service (IRS)" and its "job is to strive to ensure that every taxpayer is treated fairly and knows and understands their rights." https://www.taxpayeradvocate.irs.gov/about-us/ (last visited Feb. 5, 2024).

[4] *National Taxpayer Advocate Annual Report to Congress 2023*, https://www.taxpayeradvocate.irs.gov/reports/2023-annual-report-to-congress/full-report/ at page 47 (last visited Feb. 5, 2024).

## JURISDICTION AND STANDING

15.     This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 552(a)(4)(B).

## PARTIES

17.     WB is a boutique law firm with offices in Washington, D.C. and Tysons, Virginia that focuses on government contracts law, litigation, and corporate law. WB is not the Plaintiff in this matter, but is instead the prior organizational principal under whose aegis Mr. Panzer first submitted the FOIA Requests at issue. Mr. Panzer transitioned his practice to Fluet on or about January 19, 2024.

18.     Fluet, the Plaintiff, is a boutique law firm located in Tysons, Virginia that focuses on international trade, government contracts law, litigation, and corporate law. To keep the FOIA Requests at issue with Mr. Panzer, who has assumed stewardship of those requests, and to recognize that Fluet had acquired a stake in this litigation when Mr. Panzer joined the firm, WB and Fluet executed an Assignment and Assumption Agreement on February 5, 2024. By the Assignment and Assumption Agreement, based on *Nat'l Sec. Counselors v. C.I.A.*, 898 F. Supp. 2d 333 (D.D.C. 2012), *aff'd* 969 F.3d 406 (D.C. Cir. 2020), WB assigned, granted, conveyed, and transferred to Fluet all of WB's right, title, and interest in and to the FOIA requests at issue, including without limitation the right to pursue any administrative or legal methods at WB's disposal with respect to the requests and any claims WB may have with respect to the requests. *See* Exhibit A (Assignment Agreement). By that same agreement, Fluet accepted such assignment and assumed all of WB's duties and obligations relating to the requests. *Id.*

19.     The Treasury, one of the two Defendants, is an Executive Branch department of the United States Government and is "responsible for promoting economic prosperity and ensuring the financial security of the United States."[5]

20.     The IRS, the other Defendant, is an operating bureau of the Treasury and "is responsible for determining, assessing, and collecting internal revenue in the United States."[6]

## LEGAL FRAMEWORK

21.     The Federal Government's disclosure mandate under FOIA is broad, and the statute requires agencies to produce records that are "reasonably described" by a requester who has complied with the "published rules stating the time, place, fees (if any) and procedures to be followed" in connection with submitting a FOIA request (with certain limited exceptions). *See* 5 U.S.C. § 552(a)(3)(A).

22.     As a first step, once it receives a FOIA request, an agency must "determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) . . . whether to comply with such request," and "shall immediately notify" the requester of (1) "such determination and the reasons therefor," (2) the right of the requester "to seek assistance from the FOIA Public Liaison of the agency," and (3) "in the case of an adverse determination," the right of the requester to submit an appeal to the head of the agency and to "seek dispute resolution services from the FOIA Public Liaison of the agency or the Office of Government Information Services." *Id.* § 552(a)(6)(A)(i).

---

[5] *Role of the Treasury*, U.S. Dep't of the Treasury, https://home.treasury.gov/about/general-information/role-of-the-treasury (last visited Feb. 5, 2024).

[6] *Bureaus*, U.S. Dep't of the Treasury, https://home.treasury.gov/about/bureaus (last visited Feb. 5, 2024).

23.     In *Citizens for Responsibility & Ethics in Washington v. FEC*, 711 F.3d 180, 188 (D.C. Cir. 2013) ("*CREW*"), the U.S. Court of Appeals for the District of Columbia Circuit explained that in order to make the "determination" required by 5 U.S.C. § 552(a)(6)(A)(i), the agency must at least: "(i) gather and review the [records sought]; (ii) determine and communicate the scope of the [records] it intends to produce and withhold, and the reasons for withholding any [records]; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *CREW*, 711 F.3d at 188.

24.     Congress has specified limited circumstances in which federal agencies may obtain more time to make the above-mentioned "determination." First, an agency may toll the 20-working day deadline to seek additional information from a requester or "to clarify with the requester issues regarding fee assessment," but in either case, "the agency's receipt of the requester's response . . . ends the tolling period." 5 U.S.C. § 552(a)(6)(A)(ii).

25.     Second, an agency may extend the 20-working day deadline for an additional ten working days by giving a written notice to the requester that sets forth "unusual circumstances" to justify a deadline extension and providing the date by which the agency expects to make the determination. *Id.* § 552(a)(6)(B)(i). If the agency wants to extend the deadline for more than ten working days, the agency must notify the requester "that the request cannot be processed within the time limit specified in that clause and shall provide the [requester] an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request." *Id.* § 552(a)(6)(B)(ii).

26.     If an agency *does* issue a determination with respect to a FOIA request and that determination is adverse, the requester may submit an appeal to the head of the agency, who must

make a determination with respect to any appeal within twenty working days. *Id.* §§ 552(a)(6)(A)(i)-(ii).

27.     Furthermore, any person seeking records pursuant to 5 U.S.C. § 552 "shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions." *Id.* § 552(a)(6)(C)(i). At this point, a requester may challenge an agency's failure to follow FOIA's processing deadlines in U.S. District Court.

28.     A requester's refusal to reasonably modify their request for records or arrange an alternative time frame for a response to their request when asked to do so by an agency "may be considered as a factor" by the District Court in determining whether "exceptional circumstances" exist that should permit "the agency additional time to complete its review of the records." *See id.* §§ 552(a)(6)(B)(ii), 552(a)(6)(C)(i). However, and notably, "the term 'exceptional circumstances' does not include a delay that results from a predictable agency workload of requests . . ., unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." *Id.* § 552(a)(6)(C)(ii).

29.     Regarding the actual production of records, "[u]pon any determination by an agency to comply with a request for records, the records shall be made promptly available" to the requester. *Id.* § 552(a)(6)(C)(i).

30.     Finally, Congress recognized that in certain limited instances, records may be withheld from FOIA's broad disclosure mandate, and therefore, it created nine categories of exemptions. *See id.* § 552(b). Of relevance to this case, one of the exemptions covers "matters that are . . . specifically exempted from disclosure by statute." *Id.* § 552(b)(3). A provision of the U.S.

Code, 26 U.S.C. § 6103, generally restricts the U.S. Government's ability to disclose tax return information, but no such information was sought in the FOIA requests at issue in this case.

## STATEMENT OF FACTS

I.    *The IRS Report*

31.    The IRA, which President Biden signed into law on August 16, 2022, allocated $15 million to the IRS for a report prepared by a "Task Force to Design an IRS-Run Free 'Direct Efile' Tax Return System." Pub. L. No. 117-169, § 10301(1)(B), 136 Stat. 1818, 1832 (2022).

32.    Specifically, Congress directed the IRS to prepare and deliver a report to Congress that explored:

> "(I) the cost (including options for differential coverage based on taxpayer adjusted gross income and return complexity) of developing and running a free direct efile tax return system, including costs to build and administer each release, with a focus on multi-lingual and mobile-friendly features and safeguards for taxpayer data; (II) taxpayer opinions, expectations, and level of trust, based on surveys, for such a free direct efile system; and (III) the opinions of an independent third-party on the overall feasibility, approach, schedule, cost, organizational design, and Internal Revenue Service capacity to deliver such a direct efile tax return system . . . ."

*Id.*

33.    The IRS ultimately submitted the Report to Congress on May 16, 2023.[7]

II.    *The FOIA Requests*

34.    Given the public importance of an IRS-run direct efile system, the Requester was (and continues to be) interested in learning more about how the Report was developed and about the involvement of non-profit NA and Professor Jurow Kleiman in preparing the Report. The IRS selected NA and Professor Jurow Kleiman to serve as the ostensibly independent third parties that

---

[7] *IRS Submits Direct File Report to Congress; Treasury Department Directs Pilot to Evaluate Key Issues*, Internal Revenue Serv., https://www.irs.gov/newsroom/irs-submits-direct-file-report-to-congress-treasury-department-directs-pilot-to-evaluate-key-issues (May 16, 2023).

would opine "on the overall feasibility, approach, schedule, cost, organizational design, and Internal Revenue Service capacity to deliver" a direct efile system.

35.     Upon information and belief, the engagement of NA and Professor Jurow Kleiman was some form of sole source agreement that was not publicly announced, and the IRS' decision to make such a sole source award did not conform in any way to the Competition in Contracting Act and is essentially a crony hire of friends who could be counted on to reach the IRS' desired conclusion for the Report—that the implementation of a direct efile system for tax returns would be beneficial.

36.     Indeed, in March 2023, before the IRS issued the Report, members of the Committee on Ways and Means of the U.S. House of Representatives issued the IRS a letter expressing "serious doubts about the independence" of NA and Professor Jurow Kleiman and stating that they believed the "outcome of the [IRS] study [had] been predetermined."[8]

37.     With respect to Professor Jurow Kleiman, the letter from the Committee on Ways and Means also noted that her "recent work indicate[d] a clear preference for an expansive government-run system." Along those lines, in a prior draft of a forthcoming law review article, Professor Jurow Kleiman expressed her belief that "taxpayers would only ascribe meaningful value to the most expansive version of the direct e-file program, one that includes the maximum amount of information and requires the least amount of taxpayer input."

38.     More importantly, IRS official Bridget Roberts stated at a public meeting with the tax industry in December 2022 that the IRS had chosen to use $4 million of the $15 million appropriated for the Report to begin building a prototype of the direct efile system, before the

---

[8] Comm. on Ways & Means, *Letter to Acting Commissioner Douglas O'Donnell*, https://waysandmeans.house.gov/wp-content/uploads/2023/03/03.06.2023-Ltr-on-IRS-Direct-eFile-Study.pdf (Mar. 6, 2023).

Report was even completed. This was despite the fact that the IRA only authorized the preparation of the Report, not the development of a full-fledged pilot program for the direct efile system.

39.     Ms. Roberts further disclosed that neither NA nor Professor Jurow Kleiman had been paid by the IRS for their extensive work on the Report and had instead entered into "gratuitous service agreements" with the Agency. Notably, these agreements could have violated the Anti-Deficiency Act, 31 U.S.C. §§ 1341-42, and/or other laws governing the provision of voluntary services to the government; however, the Treasury's and the IRS' continued failure to produce records related to NA and Professor Jurow Kleiman makes it more challenging to assess whether that is in fact the case. Also, it is not publicly known, and neither the IRS nor the Treasury has disclosed, what the remaining $11 million that Congress appropriated for the Report was expended upon.

40.     The Requester was also (and continues to be) interested in learning about CFA's involvement, if any, in the preparation of the Report, as well as its relationship with the IRS more generally. In February 2023, CFA announced that it had developed a design prototype of what an eventual IRS direct efile system might look like.[9] Moreover, CFA has previously partnered with the IRS on projects related to tax return preparation, such as the "GetYourRefund.org" tool that connects taxpayers with the IRS' Volunteer Income Tax Assistance ("VITA") program.[10]

---

[9] Anu Murthy & Gabriel Zucker, *A Prototype for Free, Trustworthy Tax Filing*, Code for America (Feb. 8, 2023), https://codeforamerica.org/news/federal-tax-direct-file-prototype/.

[10] *See, e.g.*, Code for Am., *Code for America and GetYourRefund.org Non-filer Learnings and Recommendations* (Apr. 15, 2021), https://files.codeforamerica.org/2021/06/16174016/filer-learnings-and-recommendations-april-2021.pdf.

41.     With these issues in mind, on March 23, 2023, the Requester submitted nearly identical FOIA requests signed by then-WB attorney Davis S. Panzer to the Treasury and the IRS seeking the following 17 categories of records related to the development of the Report:

- Category 1: All documents that list, show, or reveal any contracts (either competitive or sole source), grants, Memorandums of Understanding, or awards of any type related to the IRS's use of an independent third-party to provide an opinion on the feasibility of an IRS-run free direct efile tax return system. IRA, § 10301(1)(B).

- Category 2: All justifications and approvals ("J&As") and/or determinations and findings ("D&Fs") submitted in support of an IRS award made using other than full and open competition (to include sole source awards) to New America.

- Category 3: All documents and communications by, between, or among IRS personnel, Treasury personnel, and/or New America regarding New America's past performance and experience in any government contract or grant dealing with IRS and federal tax administration.

- Category 4: All justifications and approvals ("J&As") and/or determinations and findings ("D&Fs") submitted in support of an IRS award made using other than full and open competition (to include sole source awards) to Ariel Jurow-Kleiman.

- Category 5: All justifications and approvals ("J&As") and/or determinations and findings ("D&Fs") submitted in support of an IRS award made using other than full and open competition (to include sole source awards) to any entity providing an opinion on the feasibility of an IRS-run free direct efile tax return system. IRA, § 10301(1)(B).

- Category 6: All documents relating to meetings, including remote by video or telephone, and in-person meetings of New America personnel, Ariel Jurow-Kleiman, and/or any other expected contractors as to providing an opinion on the feasibility of an IRS-run free direct efile tax return system.

- Category 7: All internal documents and communications by, between, or among [IRS or Treasury] personnel that include the following search terms: "New America", "NA", or derivatives thereof.

- Category 8: All internal documents and communications by, between, or among [IRS or Treasury] personnel that reference the following search terms: "Ariel Jurow-Kleiman," "Professor Kleiman," "AJ Kleiman," "Ariel Stevenson," or derivatives thereof.

- Category 9: All external documents and communications by, between, or among [IRS or Treasury] personnel that reference the following search terms: "New America," "NA," or derivatives thereof.

- Category 10: All external documents and communications by, between, or among [IRS or Treasury] personnel and any other agency, executive branch official, the White House, or Member(s) of Congress that reference the following search terms: "New America", "NA", "Ariel Jurow-Kleiman", "Professor Kleiman", "AJ Kleiman", "Ariel Stevenson", or derivatives thereof. [IRS personnel who might have communicated with the White House include former IRS Commissioner Charles Rettig and [Wage & Investment] employees. Treasury personnel who might have communicated with the White House include, but is not limited to, the following: Michael Schmidt, Lily Batchelder, Mark Mazur, and Wally Adeyemo.]

- Category 11: All documents and communications by, between, or among IRS personnel and/or Treasury personnel concerning MITRE Corporation ("MITRE") being used or not used in the preparation and production of an independent third-party opinion on the feasibility of an IRS-run free direct efile tax return system. IRA, § 10301(1)(B). To the extent MITRE provided such an opinion to the IRS, or any other agency, after passage of the IRA, I request its immediate production.

- Category 12: All documents and communications by, between, or among [IRS or Treasury] personnel that refer to the requirement that the IRS select an "independent third party" to draft a report on the IRS's capability to deliver a direct efile tax return system. *See* IRA, § 10301(1)(B).

- Category 13: All documents and communications by, between, or among [IRS or Treasury] personnel that set forth the criteria the IRS used to select its independent third-party evaluator in accordance with the IRA, § 10301(1)(B).

- Category 14: All communications from [the IRS or Treasury] to the U.S. House of Representatives Committee on Ways and Means, and/or the U.S. Senate Committee on Finance, that reference New America.

- Category 15: All documents that list the [IRS or Treasury] personnel who were involved in the selection process of New America and Ariel Jurow-Kleiman to act as the independent third-party evaluators in connection with the IRA, § 10301(1)(B).

- Category 16: All documents and communications by, between, or among [IRS or Treasury] personnel relating to how [the IRS or Treasury] has spent, or plans to spend, the $15 million provided through IRA, § 10301(1)(B); including, but not limited to, documents, and communications relating to each individual and/or entity that has received funding, how much funding each received, and what each is being asked to do with that funding.

- Category 17: All documents or communications by, between, or among [IRS or Treasury] personnel relating to any organization paid or consulted on an aspect of the IRS or the Department of Treasury's work related to IRA, § 10301(1)(B), including but not limited to "Code for America."

*See* Exhibits B and C (hard-copy versions of the "March 23 IRS Request" and "March 23 Treasury Request," respectively, which, although dated March 24, 2023, were submitted to the agencies on March 23, 2023).[11]

42. Then, on March 28, 2023 (to the IRS) and March 29, 2023 (to the Treasury), the Requester submitted another set of FOIA requests signed by Mr. Panzer (also nearly identical to one another). This time, these FOIA Requests focused on the agencies' relationship with CFA. These requests sought the following categories of records:

- Category 1: Agreement and Negotiation Documents: I request all documents and communications by, between, or among [IRS or Treasury] personnel and/or [Treasury or IRS] personnel with CFA representatives regarding any agreement(s) (to include any competitive or soles source contracts), memorandum of understanding, Other Transaction Authority award(s), grant agreement(s), or other form of agreement that in any manner authorized CFA to have its software programs or code publicly available on VITA's IRS.gov website, including that portion of the [Child Tax Credit] that allowed taxpayers who had not filed tax returns to obtain the CTC, and/or to complete a CFA-sponsored tax return.

- Category 2: Government Funds Paid to CFA Related to any Agreement(s) Listed in Request 1: For any agreement(s) responsive to Request 1, I request all documents and/or communications regarding government payment of funds, including, but not limited to, funds paid or due to be paid as a VITA grantee or in any other manner by [IRS and/or Treasury]. If no documents indicate CFA has received funds for software products or services it provided to the federal government – in effect making CFA a "volunteer" delivering those products or services – please provide all documents or communications that analyze or assess how this provision of software or services complies with requirements of Title 31 of the United States Code.

- Category 3: All documents or communications relating to meetings, including remote or video or telephone, and in- person meetings of CFA personnel and [IRS or Treasury] personnel in Requests 1 or 2.

---

[11] The FOIA Request submitted to the Treasury was assigned tracking number 2023-FOIA-00331 and the FOIA Request submitted to the IRS was assigned tracking number 2023-11126.

- Category 4: All documents and communications by, between, or among [IRS or Treasury] personnel that include the following search terms: "Code for America", "CFA", or derivatives thereof.

- Category 5: White House and Treasury Communications Are Included in Requests 1, 2, 3, and 4 above: All documents and communications by, between, or among [IRS or Treasury] personnel, White House personnel, and/or [IRS or Treasury] personnel, to include any responses from [IRS or Treasury] personnel relating to Requests 1, 2, 3, and 4. Responsive documents are likely to be found with the [IRS or Treasury] offices listed above these requests.

- Category 6: Rejected Returns By CFA: All documents or communications by, between, or among the [IRS or Treasury] and/or CFA that address: (a) the total number of tax returns submitted by CFA in calendar year 2021 through 2022; and (b) the number and/or percentage of such tax returns rejected by the IRS that were submitted by CFA, including those that were rejected because they were fraudulently filed, suspected of being fraudulently filed, or were filed after a return had already been submitted. I am not seeking documents that disclose individual tax return information, only document(s) that contain[] summaries of anonymized return data and reasons for such rejection.

- Category 7: CFA Compliance with IRS Publication 1345 Requirements: All documents or communications by, between, or among the [IRS or Treasury] and/or CFA regarding CFA's (a) compliance with the requirements contained in IRS Publication 1345, and (b) Participants Acceptance Testing System ('PATS') testing of CFA software. I do not seek [i]ndividual tax return data, only documents with anonymized summaries of aggregated return data.

*See* Exhibits D and E (the "March 28 IRS Request" and the "March 29 Treasury Request," respectively).[12]

43.    In each of its Requests, the Requester provided the agencies with the time period from which it was seeking records, noted which offices and units were likely to possess responsive records, and requested that the agencies prioritize certain categories of records, provide an index of any withheld records, confirm in writing when they determined that all responsive records had

---

[12] The FOIA Request submitted to the Treasury was assigned tracking number 2023-FOIA-00351 and the FOIA Request submitted to the IRS was assigned tracking number 2023-11421.

"been furnished or specifically identified and denied under . . . Section 552(b) of FOIA," and confirm in writing if the agencies did not have any records responsive to a particular category of records. The Requester also stated that it would accept rolling productions of records.

III.     *Requester's Interactions with the Treasury*

a.     The March 23 Treasury Request

44.     In an April 12, 2023 letter, the Treasury acknowledged the Requester's March 23 Treasury Request. *See* Exhibit F. In the letter, Cawana Pearson of the agency's Office of Privacy, Transparency, and Records noted that she had "initiated a search within the Departmental Offices for records that would be responsive" to the request.

45.     Ms. Pearson also noted that there were "unusual circumstances" that may "delay [the Treasury's] response," which could include "the need to consult with multiple program offices, to review a voluminous quantity of records, or to search for records stored in multiple locations." Therefore, Ms. Pearson invited the Requester to limit the scope of its March 24 Treasury Request.

46.     In a subsequent letter dated April 21, 2023, Ms. Pearson stated that "Program Offices [had] started the search for potentially responsive records," but also that one program office was seeking for the Requester to narrow the scope of its request for Categories 9-10, 14, and 16. *See* Exhibit G.

47.     With respect to Categories 9 and 10, the Treasury stated: "'NA' is too broad of a search term and completely unrelated things come up. Also, emails related to New America as a stakeholder for other issues/areas came up, which isn't germane to this FOIA. Should be limited to New America and related searches that are related to the direct file third party evaluation."

48.     For Category 14, the Treasury stated: "Instead of the search term being 'New America', it should be related to the direct file study."

49.     Regarding Category 16, the Treasury stated: "Should be limited to what has been 'spent' not spent and communications around this for the third party evaluators, not overall because that seems to go beyond what you are interested in (which is the choice of the 3rd party evaluator)."

50.     On April 25, 2023, WB attorney Peter T. Marx responded to Ms. Pearson's letter of April 21. Mr. Marx's email outlined the Requester's responses to the Treasury program office's request to narrow the scope of certain categories of records sought in the March 24 Treasury Request. *See* Exhibit H.

51.     In his email, Mr. Marx reemphasized the Requester's statements in its FOIA request that it was interested in expediting certain categories of records and that it was willing to accept a rolling release of records. By this time, Mr. Marx explained, the Requester wished for the Treasury to prioritize the search for Category 11 records, which the Requester expected to be "relatively easy to identify, redact, and release."

52.     With respect to Categories 9 and 10, Mr. Marx suggested ways for the Treasury to adjust the "NA" search term to "help reduce the universe of responsive documents" (e.g., by using "-NA-" to exclude false positive results for "N/A").

53.     Regarding Category 14, Mr. Marx noted that the specific request seeking those records could "be clarified by asking for communications about the direct file study, or the organization New America," but stated that the Requester did not want "to limit communications to the direct [file study]" only.

54.     Regarding Category 16, Mr. Marx explained that the Treasury should not limit its search to only records related to what had been "spent" on the IRS' report thus far. Rather, Mr. Marx stated, Category 16 "should be processed as written."

55.     Ms. Pearson responded to Mr. Marx's email on April 25, 2023, thanking him for providing further clarification with respect to the March 24 Treasury Request. She stated that she would "follow up with the program office and hopefully, have a response in a couple od [*sic*] days." *See id.*

56.     On May 3, 2023, Mr. Marx sent Ms. Pearson an email checking on the status of the FOIA Requests. Ms. Pearson responded that same day, stating that she had shared Mr. Marx's "feedback in response to the program office which requested [the Requester] provide additional information/narrowed scope and have not received a response yet." *See id.*

57.     On May 12, 2023, Ms. Pearson stated in an email to Mr. Marx that the March 23 Treasury Request, 2023-FOIA-00331, had been "assigned to several program offices and remains in the search phase of the FOIA process." *See* Exhibit I.

58.     To date, the Treasury has not issued a determination to the Requester explaining whether it will comply with any part of the March 23 Treasury Request, and it has not produced any documents responsive to the Request.

b.     <u>The March 29 Treasury Request</u>

59.     By early May, apart from an automated email acknowledging receipt of the Request, the Requester had not received any communications from the Treasury regarding the March 29 Treasury Request.

60.     On May 4, 2023, Mr. Marx emailed Ms. Pearson seeking an update on the status of the March 29 Treasury Request. In this email, Mr. Marx reminded Ms. Pearson that the 20-working day deadline for the Treasury to determine whether it would comply with the request was April 26, 2023. Ms. Pearson responded that same day, stating that she would "follow up with the program office and get back with [Mr. Marx] ASAP." *See* Exhibit J.

61.     On May 10, 2023, Ms. Pearson issued a letter addressing Category 4 of the Requester's March 29 Treasury Request, which requested "[a]ll documents and communications by, between, or among Treasury personnel that include the following search terms: 'Code for America', 'CFA', or derivatives thereof." Specifically, the letter asserted that this part of the request was "unclear" as to "what specific records" the Requester sought and requested that the Requester "reply to this letter and provide additional information" about the records described by Category 4. *See* Exhibit K.

62.     In a May 12 email to Ms. Pearson, Mr. Marx stated that he would "come up with some specifics as to request #4." *See* Exhibit I.

63.     To date, the Treasury has not issued a determination to the Requester explaining whether it will comply with any part of the March 29 Treasury Request, and it has not produced any documents responsive to the Request.

IV.     *The Requester's Interactions with the IRS*

    a.     Initial Communications Regarding Both Requests

64.     Throughout early April 2023, the Requester attempted to contact the IRS on multiple occasions to discuss the status of both the March 23 and March 28 IRS Requests.

65.     On April 20, the Requester finally spoke with Deanna J. Fitti-Hager, the Disclosure Manager overseeing both requests. During that call, Mr. Marx explained that the Requester wanted the IRS to prioritize Category 11 of the March 23 IRS Request, which sought documents and communications concerning MITRE "being used or not used in the preparation and production of an independent third-party opinion on the feasibility of an IRS-run free direct efile tax return system." Mr. Marx also emphasized that the Requester was willing to receive responsive records on a rolling basis.

66.     On that same day, the IRS issued a Voluntary Extension Letter stating that it would need until July 20, 2023 to respond to the March 23 IRS Request. On April 21, the IRS issued a similar letter for the March 28 IRS Request stating that it would need until May 26, 2023 to respond to that Request.

67.     On April 25, the Requester participated in a conference call with the IRS Disclosure Manager and the specialists working on the two IRS FOIA Requests. During this call, the parties discussed strategies for reducing the time needed for the IRS to respond to the IRS FOIA Requests. The IRS specialists also remarked that they were struggling to figure out where to begin their search for responsive records because the IRS had recently reorganized itself and noted that the IRS' information technology systems and databases were antiquated, which would make the search difficult.

68.     Following the April 25 call, the Requester did what it could to assist the IRS with speeding up its search for responsive records. For example, on May 1, the Requester informed the IRS that it should prioritize its search for responsive records in the files of the agency's Taxpayer Experience Office. And on May 15, the Requester provided the IRS with news articles related to the categories of records described in the March 23 IRS Request; the IRS later confirmed that these articles were provided to the agency's Transformation and Strategy Office for the purposes of locating responsive records.

b.     The March 23 IRS Request

69.     Other than the conversations described above, the Requester's interactions with the IRS regarding the March 23 IRS Request have been very limited.

70.     On July 20, 2023, the Disclosure Manager sent the Requester a letter requesting additional time to search for and collect records responsive to the Request.

71.     On October 19, 2023, the Disclosure Manager sent the Requester another letter explaining that she needed "additional time to search for and, to the extent that records exist, collect requested records from other locations." *See* Exhibit L. The letter also informed the Requester that the Disclosure Manager expected to provide a final response by January 19, 2024.

72.     To date, the IRS has not issued a determination explaining whether it will comply with any part of the March 23 IRS Request, and it has not produced any documents responsive to the Request.

c.     The March 28 IRS Request

73.     On May 17, 2023, the Disclosure Manager provided an "interim response" to the March 28 IRS Request, *see* Exhibit M (the "May 17 Interim Response"), and produced ten pages of documents that it claimed were responsive to the Request. The documents produced by the IRS consisted of a May 2022 letter from the IRS to the Senate Finance Committee, as well as attachments, responding to questions from that committee about the IRS' relationship with CFA. *See id*.

74.     However, in the May 17 Interim Response, the Disclosure Manager did not explain which specific section of the Requester's March 28 IRS Request the documents were responsive to.

75.     The Disclosure Manager also claimed that it was "unable to process the remaining portions of [the March 28 IRS Request] as they are overly broad in nature and do not meet the requirements of the FOIA or the applicable agency regulations."

76.     In both the May 17 Interim Response and in subsequent oral communications with the Requester, the IRS encouraged the Requester to submit an "updated" or "re-scoped" FOIA

request that more specifically described the records sought by the Requester regarding the IRS'
relationship with CFA.

77.     The Requester submitted a "re-scoped" version of the March 28 IRS Request on
July 21, 2023. *See* Exhibit N (the "Re-Scoped March 28 IRS Request").

78.     The Re-Scoped March 28 IRS Request sought the same categories of records
regarding the IRS' relationship with CFA as the March 28 IRS Request, but it narrowed the scope
of the prior CFA-focused request by shortening the list of IRS personnel and offices from which
records were being sought. Specifically, the Re-Scoped March 28 IRS Request sought records
from the Taxpayer Experience Office, the Transformation and Strategy Office, employee Bridget
Roberts (Acting Transformation and Strategy Officer), the VITA Stakeholder Partnerships,
Education and Communication ("SPEC") office, and the Wage & Investment Division (to include
Kenneth Corbin and his senior staff).

79.     The Re-Scoped March 28 IRS Request also attempted to assist the IRS with
locating responsive records by providing the names of relevant individuals for the IRS to use as
search terms ("Gabriel Zucker," "Kelly McBride," "Laurel Blatchford," "Walley Adeyemo," and
"Anu Murthy").

80.     On July 31, 2023, the Disclosure Manager issued a "final response" to the Re-
Scoped March 28 IRS Request (the "July 31 Final Response"). *See* Exhibit O. Despite the
Requester's efforts to narrow the scope of its CFA-focused FOIA request and make it easier for
the IRS to find responsive records, the July 31 Final Response determined—without any
explanation—that the "re-scoped request as provided remain[ed] overly broad in nature and [could
not] be processed because it [did] not meet the requirements of the FOIA or the applicable agency
regulations."

81.     The July 31 Final Response also noted that the IRS was withholding the release of certain records on the basis that the Re-Scoped March 28 IRS Request "asks for third party return information," which is exempt from disclosure under FOIA pursuant to 5 U.S.C. § 552(b)(3) (providing that FOIA does not apply to matters exempted by statute) and 26 U.S.C. § 6103 (specifically limiting the disclosure of "return information" except under certain circumstances).

82.     In accordance with the appeal rights provision of the July 31 Final Response, on October 24, 2023, the Requester submitted an administrative appeal of the Disclosure Manager's determination to the agency's Independent Office of Appeals. *See* Exhibit P (the "October 24 IRS Appeal").[13]

83.     The October 24 IRS Appeal explained that the IRS' July 31 Final Response failed to provide any rationale for why it considered either the March 28 IRS Request or the re-scoped version of the Request to be overly broad or to place "an unreasonable burden upon the IRS." The Requester further explained that its CFA-focused FOIA request was not overly broad because "[t]he documents and communications sought were reasonably described[] in sufficient detail for the Agency to conduct an effective search."

84.     The October 24 IRS Appeal also explained that contrary to the Disclosure Manager's claim, the March 28 IRS Request did not seek "return information" as defined by 26 U.S.C. § 6103. In fact, the Request explicitly clarified that the Requester did not seek records disclosing "individual tax return information, only document(s) that contain summaries of anonymized return data and reasons for" their rejection.

---

[13] The Requester submitted its appeal by mail to the address provided in IRS Notice 393, which was attached to the July 31 Final Response. The Requester submitted another copy of the appeal to the IRS on October 26, 2023 out of an abundance of caution after the initial package was inexplicably being held by the U.S. Postal Service *after* it should have been delivered to the IRS.

85.     On November 14, 2023, a representative of the IRS' Independent Office of Appeals contacted Mr. Panzer by telephone and explained that the Office was planning to deny the Requester's appeal on the basis that the issue of whether the March 28 IRS Request was overly broad was "unappealable." While this IRS employee indicated that a written denial of the Requester's appeal would be forthcoming, to date, no such decision or determination has issued.

## COUNT I
## The Treasury Missed FOIA's Mandatory Determination Deadline for Both of the Requester's Treasury Requests

86.     Plaintiff re-alleges and incorporates by reference the allegations made in paragraphs 1 through 85.

87.     Fluet, by assignment from WB, has a statutory right to final determinations from the Treasury regarding the March 23 Treasury Request and the March 29 Treasury Request in a manner that complies with FOIA. The Treasury has violated Fluet's rights in this regard by unlawfully delaying its provision of a FOIA-compliant determination beyond the deadline that FOIA mandates.

88.     As to the Treasury's request for additional information regarding the specific records sought by Category 4 of the March 29 Treasury Request, even if the Treasury has concluded that the Requester is no longer interested in receiving such records, it did not indicate in any of its correspondence with the Requester that there was any question about the *other* categories of records described in that Request. Therefore, at the least, the Treasury has violated Fluet's rights under FOIA by declining to issue a determination for the other categories of records sought by the Request within the time period prescribed by the statute (*i.e.*, the records sought by Categories 1-3 and 5-7).

89.     Additionally, Category 4 of the March 29 Treasury Request adequately described the records that Fluet is seeking—*all* "documents and communications by, between, or among Treasury personnel that include" the terms "Code for America," "CFA," or "derivatives thereof." The Requester also indicated in its Request which Treasury offices were likely to have responsive records, specifically, the offices of: Diversity, Equity, Inclusion, and Accessibility; General Counsel; Management; Public Affairs; Tax Policy; the Deputy Secretary of the Treasury; the Chief of Staff "and departments thereunder"; the Assistant Secretary for Public Affairs; the Assistant Secretary for Tax Policy; and the Assistant Secretary for Legislative Affairs. *See* Exhibit E.

90.     Therefore, contrary to Ms. Pearson's allegation in her letter of May 10, 2023, *see* Exhibit K, the Requester described the records it sought through Category 4 of the March 29 Treasury Request in "reasonably sufficient detail to enable" Treasury employees to find them.

91.     Fluet's ability to learn about a matter of crucial public importance—the development of the Report, which addressed the possible implementation of an IRS-run direct efile program for tax returns (a program that the IRS appears to now be moving forward with)—will be adversely affected if the Treasury is allowed to continue violating FOIA's determination deadlines as it has done so with respect to the facts underlying this count.

92.     Unless enjoined and made subject to a declaration of Fluet's legal rights by this Court, the Treasury will continue to violate Fluet's rights to receive public records under FOIA.

93.     Fluet is entitled to reasonable costs of litigation and attorney fees pursuant to FOIA. 5 U.S.C. § 552(a)(4)(E)(i).

## COUNT II
### The IRS Missed FOIA's Mandatory Determination Deadline for the March 23 IRS Request

94.     Plaintiff re-alleges and incorporates by reference the allegations made in paragraphs 1 through 93.

95.     Fluet, by assignment from WB, has a statutory right to a final determination from the IRS regarding the March 23 IRS Request in a manner that complies with FOIA. The IRS has violated Fluet's rights in this regard by unlawfully delaying its provision of a FOIA-compliant determination beyond the deadline that FOIA mandates.

96.     Fluet's ability to learn about a matter of crucial public importance—the development of the Report, which addressed the possible implementation of an IRS-run direct efile program for tax returns (a program that the IRS appears to now be moving forward with)—will be adversely affected if the IRS is allowed to continue violating FOIA's determination deadlines as it has done so with respect to the facts underlying this count.

97.     Unless enjoined and made subject to a declaration of Fluet's legal rights by this Court, the IRS will continue to violate Fluet's rights to receive public records under FOIA.

98.     Fluet is entitled to reasonable costs of litigation and attorney fees pursuant to FOIA. 5 U.S.C. § 552(a)(4)(E)(i).

## COUNT III
**The IRS Missed FOIA's Deadline for Issuing a Decision Regarding the Requester's Appeal of the July 31 Final Response, and the July 31 Final Response Was Contrary to Law**

99.     Plaintiff re-alleges and incorporates by reference the allegations made in paragraphs 1 through 98.

100.    Fluet, by assignment from WB, has a statutory right to a decision from the IRS' Independent Office of Appeals regarding the Requester's appeal of the July 31 Final Response (which denied the March 28 IRS Request) that complies with the deadline mandated by FOIA. While a representative of the Independent Office of Appeals informed the Requester by telephone on November 14 that the Office planned to deny the appeal, no formal decision has been issued as of the date of this Complaint.

101.    Alternatively, if the IRS' communication on November 14 constituted a procedurally proper denial of the Requester's appeal of the July 31 Final Response, the denial, like the July 31 Final Response, was contrary to law.

102.    In the July 31 Final Response, the Disclosure Manager "failed to provide any rationale for why it considered the re-scoped request overly broad or what aspect of the Request would place 'an unreasonable burden upon the IRS,'" and in any event, the Request was not overly broad and the records sought by the Requester were "reasonably described, in sufficient detail for the Agency to conduct an effective search." Exhibit P.

103.    Further, while the Disclosure Manager stated that the March 28 IRS Request sought "return information" exempted from FOIA, this is simply incorrect. The March 28 IRS Request clearly and explicitly sought only reports, summaries, and documents discussing *quantities* of tax returns, not "return information."

104.    Fluet's ability to learn about a matter of crucial public importance—the development of the Report, which addressed the possible implementation of an IRS-run direct efile program for tax returns (a program that the IRS appears to now be moving forward with)—will be adversely affected if the IRS is allowed to continue violating FOIA's provisions as it has done so with respect to the facts underlying this count.

105.    Unless enjoined and made subject to a declaration of Fluet's legal rights by this Court, the IRS will continue to violate Fluet's rights to receive public records under FOIA.

106.    Fluet is entitled to reasonable costs of litigation and attorney fees pursuant to FOIA. 5 U.S.C. § 552(a)(4)(E)(i).

**Prayer for Relief**

Wherefore, Fluet respectfully requests that this Court:

A.      Declare that the Treasury and the IRS have violated FOIA;

B.      Order the Treasury to make a FOIA-compliant determination regarding the March 23 Treasury Request and the March 29 Treasury Request;

C.      Order the IRS to make a FOIA-compliant determination regarding the March 23 IRS Request;

D.      Order the IRS' Independent Office of Appeals to issue a FOIA-compliant decision with respect to the Requester's appeal of the July 31 Final Response, and if the decision is a denial of the Requester's appeal, declare that the decision is contrary to law;

E.      Order both the Treasury and the IRS to make records responsive to the FOIA Requests promptly available by a date certain;

F.      Retain jurisdiction to ensure that the Treasury and the IRS provide Fluet, as WB's assignee, all of the responsive records and the reasonably segregable portions of any lawfully exempt records sought by the Requester's FOIA Requests by a date on which all parties and the Court can agree;

G.      Award Fluet its costs and reasonable attorney fees pursuant to 5 U.S.C. § 552(a)(4)(E)(i) or 28 U.S.C. § 2412; and

H.      Grant such other and further relief as the Court may deem just and proper.

Dated: February 5, 2024                    Respectfully submitted,


                                           */s/ David S. Panzer*
                                           David S. Panzer, D.C. Bar No. 470677
                                           **Fluet**
                                           1751 Pinnacle Drive, Suite 1000
                                           Tysons, Virginia 22102
                                           T: (703) 590-1234
                                           F: (703) 590-0366
                                           DPanzer@fluet.law
                                           e-file@fluet.law

                                           *Counsel for Plaintiff*